BARREDA Y OSMA v. BROWN et al.

(Circuit Court, D. Maryland. May 12, 1910.)

CORPORATIONS (§ 121*)—SALES OF STOCK—SUFFICIENCY.
Evidence *held* to show that the agents of the owner of stock in a railroad acted in good faith, and made an open and fair disclosure to him of all facts within their knowledge when they offered to buy the stock at a price fixed by himself.

[Ed. Note.—For other cases, see Corporations, Dec. Dig. § 121.*]

In Equity. Suit by Felipe Barreda y Osma against Alexander Brown and another. Bill dismissed.

S. S. Field, James H. Preston, and Ferdinand C. Dugan, for complainant.

Gans & Haman, for defendants.

MORRIS, District Judge. This is a suit in equity to recover the difference between the price paid the complainant for 703 shares of

the stock of the Baltimore & Annapolis Short Line Railroad Company and the price which the complainant alleges he could have realized if the respondents, as his agents, had fully disclosed to him facts within their knowledge at the time when they bought his stock from him. The complainant is a banker of Lima, Peru, who was a business correspondent of Alexander Brown & Sons, the respondents, whose banking house has been for many years established in Baltimore, Md. The complainant had inherited from his father 703 shares of the stock of the Annapolis Short Line Railroad Company, which owned and operated a steam railroad line 25 miles in length from Annapolis to within a short distance of Baltimore and by contract with the Baltimore & Ohio Railroad Company the Short Line had the privilege of entering Baltimore over its tracks, and delivering its passengers at the Baltimore & Ohio Railroad's Camden Station. It was capitalized at $358,000, being 3,580 shares at $100 each. It was unincumbered, and was declaring dividends at the rate of 8 per cent. a year, and really earning somewhat more. Of the shares of its stock the firm of Messrs. Alexander Brown & Sons, the respondents, and the partners in that firm, owned about 1,000 and Mr. Barreda 703, so that while their united holdings did not constitute a majority of the shares, those holdings were enough to give control. The shares of this stock held by both parties to this suit were acquired in the reorganization of a prior railroad corporation. The certificates for the 703 shares of the Short Line stock belonging to the complainant had been left in the hands of the respondents. Under date of May 15, 1897, nearly nine years before the transaction now in question, Mr. Barreda had written the respondents requesting them to have the shares of stock registered in the name of respondents' firm, so that upon the order of Mr. Barreda, or of his brother, the stock could be disposed of. In October, 1901, the Browns wrote Mr. Barreda that overtures had been made looking to the purchase of a majority of the stock, and desiring to know if Barreda would authorize a sale of his holdings at the same price the Browns obtained, not less than $100 per share. Barreda replied by cable and also by letter authorizing a sale at not less than par. Under date of April 16, 1902, the Browns wrote Barreda that the negotiations were abandoned, but that another party had offered $75 per share for a limited amount of the stock. To this Barreda replied that as he understood the Browns had not accepted the offer of $75 he would not accept it. Two years later, in May, 1904, the Browns wrote that there were occasional inquiries for the stock, the last quotation being $85 to $90, and they desired to know if Barreda wished to sell if the opportunity offered. In reply Barreda wrote:

"I beg to say that I request you to sell at par."

In October, 1904, Barreda wrote requesting to be informed at what price the stock was then selling. To this the Browns replied that the last sale was $108, and said:

"If it is your desire to sell the stock you hold it could probably be marketed at between 100 and 108. Such a large block could hardly be sold at a higher price. The next meeting of the stockholders of the railroad company will be held on Wednesday next, the 14th instant, at which we are

informed it is expected a semi-annual dividend of 4% for the past six months will be declared."

About a year later, October 25, 1905, after referring to their previous correspondence, the Browns wrote:

"We now beg to say we have recently heard of the sale of a small block of this stock at $130. One hundred and ten is now bid for the stock, and we thought that with a firm order on hand to sell we could probably dispose of your stock at between 110 and 125, and if you would care to dispose of your entire holdings of 703 shares we would thank you to cable us at once the price at which you would authorize us to sell."

In answer to this Barreda cabled:

"Sell at one hundred and twenty-five."

To this the Browns replied, November 29, 1905:

"We will keep the order open, but the best price obtainable at the moment is $110. The stock, as you know is very inactive, and there has been no quotations of it since we wrote. The Pennsylvania Railroad Company has just put on a fast through service between Baltimore and Annapolis in competition with the Short Line Railroad, but whether or not it will materially affect the passenger earnings of the Short Line we cannot, of course, tell. The contract between the Short Line and Baltimore & Ohio Railroad Company expires in 1907 and we do not yet know if it can be renewed on as favorable terms as heretofore."

Under date January 5, 1906, the Browns wrote Barreda advising him of having remitted the 4 per cent. semiannual dividend on his stock, and added:

"We duly received your favor of the 29th of November, but have not been able to dispose of your stock at $125. We shall keep the order open until canceled by you, and will advise you promptly in case a sale is effected. There have been no transactions in it since we wrote you."

In a letter dated Lima, January 25, 1906, Mr. Barreda wrote the Browns:

"In case you sell this stock you may advise me from 1st March to the 1st of July next at address on foot." (28 Avenue Hoche, Paris.) "Prior and after those dates you may address me as usual."

On May 28, 1906, the Browns wrote Mr. Barreda the letter on which this suit hinges, and which Mr. Barreda in this suit complains of as not giving to him the full information of facts alleged to have been within the knowledge of the Browns, and which as his agents they were bound to have communicated:

"May 28th, 1906.

"Mr. F. Barreda y Osma, 28 Avenue Hoche, Paris, France.
"Dear Sir: Referring to correspondence regarding the sale of your Baltimore & Annapolis Short Line Railroad Company stock, we beg to say that if agreeable to you we ourselves will be glad to purchase your holdings at $125 per share, the price at which you instructed us to sell; although the only sale we have heard of in this market this year has been one of 40 shares at 120.

"In view of the relations that have existed between us for so many years, we feel that it is but right for us to say in confidence, that if we can procure your stock at the price named it will give us so substantial interest in the property as to offer a sufficient inducement to us to work out a plan for the electrification of the road, and, possibly, its combination with some other road. Only in this way, we believe can the Short Line be put in a position to meet

the very strong competition which it will have upon the completion of the Washington, Baltimore & Annapolis Electric Railway now under construction, as well as the competition of the Pennsylvania Railroad Company which has recently established a through service between Baltimore and Annapolis.

"In order to accomplish anything it will be necessary to take up this matter promptly, and we shall be greatly obliged if you will advise us upon receipt of this letter whether or not our offer is acceptable to you. If so, kindly instruct us regarding the remittance of the proceeds.

"Very truly yours, Alexander Brown & Sons."

On June 9th, following, the Browns not feeling certain that Barreda was in Paris cabled him:

"Have you received our letter of May 28th?"

To this cablegram Barreda replied by cable:

"Will answer favorably."

On June 11, 1906, the Browns wrote Barreda as follows:

"June 11, 1906.

"Mr. F. Barreda y Osma, 28 Avenue Hoche, Paris, France.

"Dear Sir: We beg to confirm our telegram to you of the 9th instant, reading, 'Have you received our letter of May twenty-eighth?' and to acknowledge receipt of your reply thereto reading, 'Will answer favorably.'

"We thank you for your prompt reply, and await your instructions as to the disposition of the proceeds. If you contemplate making any investments in American securities, we shall be glad to have you avail of our facilities for their purchase. We take the liberty of inclosing herewith some memoranda regarding securities which we are recommending to our friends.

"Very truly yours, Alexander Brown & Sons."

Finally Barreda wrote the Browns as follows:

"28 Avenue Hoche,
"Paris, 12 June, 1906.

"Messrs. Alexander Brown & Sons, Baltimore.

"Dear Sirs: I have received your favor of the 28th May. I accept your offer of $125, for my Baltimore & Annapolis Short Line Railway Company stock. I understand that this price does not include the dividends already earned for the first half year of 1906, and that it will be collected for my account. With the proceeds of this sale please buy $50,000 Atchison Topeka & Santa Fé 4% Convertible Bonds and remit the rest to Messrs. J. S. Morgan & Company, London, for my account.

"Yours truly, F. Barreda y Osma.

There being no other letters on the subject of the sale of Barreda's Short Line stock, and there being no personal interviews whatever, this correspondence puts before us all that passed between the parties up to the date of the sale. It is proven by the testimony that at the date when the several·letters were written every fact stated in each and every letter addressed by the Browns to Barreda was strictly and literally true, and it only remains to consider whether it is shown by the proof that there were other facts known to the Browns which they ought to have communicated to Barreda before they could, being Barreda's agent, contract to buy for themselves the stock in question at the price named by Mr. Barreda. It is to be noticed that in their letter of May 28, 1906, offering Barreda $125 per share for his stock, they state that their purpose is to buy the stock for themselves. They further say their purpose in purchasing is to acquire such a substan-

tial interest in the property as to make it worth their while to work out a plan for changing the Short Line into an electric road, and possibly combining it with some other road. They further state the competition which is impending from a parallel electric road then approaching completion and from through service established by the competing steam road of the Pennsylvania Railroad Company, requires that the Short Line shall be put in a position to meet it. This competition did become effective, and that of a parallel electric road became and is to-day a most serious factor to be taken into account in estimating the real value of the Short Line property. Barreda asked no questions whatever about the situation, but accepted the offer of $125 per share, stipulating that he was to receive also the current dividend. The complainant rests his case for equitable relief upon the contention that at the time when the Browns offered to buy his stock at $125 they had formulated and were reasonably assured of the success of a plan which would increase the value of the complainant's stock; that they did not disclose the plan to him and allow him the opportunity of deciding whether or not he would sell under the circumstances.

Let us see what the proofs show was then known to the Browns. They knew, or were reasonable persuaded, that the impending competition seriously jeopardized the earnings of this little steam road. They knew that in order to convert it into an electric road about $1,000,000 would have to be expended, and that it would run its whole length parallel with another electric road from Baltimore to Annapolis. They knew that for its entrance into Baltimore it was dependent on the Baltimore & Ohio Railroad Company renewing a contract which then had only about a year to run, and about which there were unsettled questions to be adjusted. They knew that the road was earning something more than enough to pay $28,000 a year in dividends, but that if $1,000,000 was borrowed to change the road to an electric one there would be an additional $50,000 a year of interest to be met. If they could by any possibility have had foreknowledge of the year 1909 they would have known that the operation of the road for that year would result in a large deficit in consequence of the competition of the parallel electric road. It is convincingly shown by the testimony of Mr. Griswold, of the firm of Alexander Brown & Sons, of Mr. France, the general counsel, and of Mr. Baetjer, special counsel, for the United Railways & Electric Company, employed to advise with respect to the difficult problem of financing that corporation, that there was no definite plan at all for using the control of the Short Line stock when the letter of May 28, 1906, was sent to Barreda. It was known that if any plan was devised by the Browns for using the Short Line Railroad in any combination it was essential that the Browns should have a large ownership of the stock of that railroad, and that was fully expressed in the letter of May 28, 1906. By the letter was also conveyed the idea that the larger the Browns' ownership of the stock of the Short Line became the more profitable to themselves would be any plan they might work out, and the more inducement there would be to them to work out such a plan. By the letter, Barreda, who was himself a banker, was certainly put

upon notice that the Browns were offering to buy his stock for purposes of their own. The real reason that the Short Line stock become desirable to the Browns was that they were very largely interested in the United Railways & Electric Company, operating all the street railways of Baltimore city, and there was a possibility of using the Short Line Railroad in connection with some plan not then formulated for the benefit of the United Railways Company. The United Railways & Electric Company in consequence of the great fire of 1904 had become straightened in its finances. As one of the effects of the great fire it had failed to pay interest on its fourteen million of income bonds, and it was without credit to borrow money, and was threatened with legal proceedings by the income bondholders. It needed improved equipment and more effective power plant and certain extensions were demanded by the public. There had been procured by persons hostile to it a charter for the Maryland Electric Railway which gave large powers in Baltimore city, and which was a menace to the United Railways, and for the protection of the United against hostile attacks the Browns had bought that charter. It was a mere paper charter and nothing had been done under it. At the time the Browns made the offer for the Barreda stock it had been suggested that in some way by combining the Short Line, which was not then incumbered, with the United a new mortgage could be financed sufficient to supply the money for the needed improvements, terminals, car barns, and extensions of the United. The idea was indefinite and without form, but at the first suggestion of it, Mr. France, counsel for the United, said it could not be considered at all unless the Browns had a controlling interest in the Short Line stock, and could give assurance that it would continue in friendly hands. It was upon this requirement being presented to the Browns that they offered 125 for the Barreda stock. The testimony is conclusive that if they had not procured it no plan involving the Short Line would have been considered at all. After the Browns had procured the Barreda stock many plans were suggested, modified, and rejected, and it was not until July 7th that a plan was finally worked out as the result of many conferences, concessions, and modifications, and in the face of difficulties and differences which at times seemed insurmountable. The final plan was ingenious and that it was successful is evidence of the ability of those who devised it and whose persistent work made it effective.

Very briefly the plan was that the Short Line should first raise $1,000,000 on a first mortgage to be used in converting it into an electric road; that it should then be merged into the Maryland Electric Railroad Company which should give six shares of its stock of the par value of $50 for each share of the Short Line stock of the par value of $100; that the Maryland Electric should then execute a mortgage for $8,000,000, of which $4,000,000 should be sold and the proceeds invested in real estate, extensions, car barns, and terminals for the use of the United, which should lease them, covenanting to pay a rental equal to 6 per cent. of the cost. It was calculated that the money borrowed by the Maryland Electric on its bonds would cost the Maryland Electric 5 per cent., while it would get 6 per cent. from the United.

This plan as finally perfected, and of which is here given the merest skeleton, was approved by the parties in interest and by the bankers' who were to furnish the $4,000,000 for the Maryland Electric bonds, about the middle of September. The Browns for the Short Line stock held by them received for each share 6 shares of Maryland Electric stock, and they still hold it, having never sold a share. It cannot be said to have a market value. At a time when the plan was dependent upon the sale of the newly created four million Maryland Electric bonds, and it was important that nothing should create any distrust as to their legality, certain stockholders who knew the situation threatened by legal proceedings to interfere and had had prepared an application to a court of equity for that purpose, were bought off at $250 for a small number of shares, and about the same time certain other small lots were bought at $200 a share, but there was not an established market price, and there is no reason to believe, either that if Barreda had continued to hold his 703 shares the plan would have been worked out at all, or that if it had been Barreda could have sold either his shares of the Short Line or their equivalent in shares of the Maryland Electric so as to have realized more than he did by the sale to the Browns.

There is no dispute as to the law applicable in this case. It has been frankly conceded from the first that the Browns' relation to Mr. Barreda was such that they were bound in offering to buy his stock for themselves to disclose fully and truthfully all the facts and circumstances within their knowledge which would have enabled Barreda to determine whether he would adhere to his standing offer to sell at $125. The testimony leaves no doubt in my opinion that they made that full disclosure which the law exacts from those who are in a like situation of trust and confidence. They could not truthfully have stated more than they did. There was no definite plan pending, and there was no certainty that any plan could be made effective, and there was no certainty that any plan, which the United and Electric Company would agree to, would include the Short Line Company or be for its benefit. In the face of all this uncertainty to have undertaken to give suggestions to Barreda would not have been to give him information on which he could base a judgment, but to suggest a mere floating possibility upon which neither he nor anyone else could form any sensible judgment.

It appears that Mr. Barreda had a nephew, Mr. Robert de Barrill, living in Maryland, who in August, 1906, wrote to him that he had heard of sales of Short Line stock and at $200, and when he learned from Mr. Barreda that he had already sold his stock to the Browns at $125 Mr. Barrill suggested to him that he had been dealt with unfairly. This led to a letter in June, 1907, from Barreda to the Browns in which Barreda stated that he could not persuade himself that the Browns had already matured their plans when they proposed to buy his 703 shares of Short Line stock from him, and requested the Browns to give to his nephew, Mr. Robert de Barrill, their explanation. An interview with Mr. Barrill was arranged, and the Browns, also, under date July 23, 1907, wrote very fully to Mr. Barreda, at

Lima, their understanding of the transactions complained of, and, further, they offered, as they had sold none of the Maryland Electric stock they had received in exchange for the Short Line stock, to return to Mr. Barreda the equivalent of his 703 shares of the Short Line of the par value of $100 a share, viz., 4,218 shares of the Maryland Electric Company of the par value of $50 a share, provided Barreda would repay the purchase money paid by them to him, with interest. This offer Mr. Barreda declined for reasons partly personal and because, if, as he stated, he had received the shares when issued he would long since have sold them to good advantage, but he made a counter offer to receive in full settlement 1,500 shares of the Maryland Electric stock. This suggestion was not entertained by the Browns, and this suit was entered.

I am of opinion that the proof establishes the good faith and the open and fair disclosure by the respondents of all facts within their knowledge when they made their offer to purchase the complainant's stock at the price he himself had fixed, and that the complainant is not entitled to a decree in his favor.

The bill of complaint will be dismissed at the cost of the complainant.